JUDGE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR14-232-JLR |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| DAVID RICHARD SCHULTZ, II, | ) | |
| Defendant. | ) | |
| | ) | |

The defendant, David Richard Schultz II, by his attorney, Assistant Federal Public Defender Mohammad Ali Hamoudi, hereby submits the following sentencing memorandum.

## I.   Introduction

As to Counts 1 and 2, Probation has recommended a term of 120 months, to run concurrent to each other. As to Count 3, Probation has recommended a term of 60 months, to run concurrent to counts 1 and 2, for a total term of 120 months. The recommendation is procedurally and substantively unreasonable.

Mr. Schultz is before this Court following a Rule 11(c) guilty plea to Endangering Human Life While Manufacturing a Controlled Substance, in violation of 18 U.S.C. § 858 and 18 U.S.C. § 2; Maintaining a Drug Involved Premises, in violation of 18 U.S.C. § 858(a)(1) and (b), and 18 U.S.C. § 2; and Manufacturing Hash Oil and Marijuana, in violation of 18 U.S.C. § 841(a)(1), (b)(1)(D), 18 U.S.C. § 846 and 18 U.S.C. § 2. In resolving this case by plea, the parties arrived at many agreements

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 1

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

regarding the relevant sentencing factors, but the Government did not agree to recommend a sentence within the applicable guideline range. Mr. Schultz did not agree to an appeal waiver.

Mr. Schultz's co-defendants, Jessie Kaplan and Daniel Strycharske, have pled guilty under plea agreements with the Government that are nearly identical to the agreement entered into by Mr. Schultz. (Dkt. 56, 59.) However, there are benefits Mr. Kaplan and Mr. Strycharske received that Mr. Schultz did not receive: the Government agreed to recommend a sentence within the sentencing guidelines range (which the defense contemplates to be 24-30 months) for Mr. Strycharske and Mr. Kaplan (Dkt. 56, p. 9:9-11; Dkt. 59, p. 9:6-8); the Government will not argue for application of Chapter 5K2.0 to enhance the sentences for Mr. Strycharske or Mr. Kaplan (Dkt. 65, p. 7:27.); and the Government will not argue for a two-level upward adjustment under U.S.S.G. § 3B1.1(c) in Mr. Strycharske's or Mr. Kaplan's case (Dkt. 65, p. 7:25-26). The defense has also been informed that Probation will recommend a sentence of 48 months for both Mr. Kaplan and Mr. Strycharske. Mr. Kaplan and Mr. Strycharske are scheduled to be sentenced on July 20, 2015. They have been out on bond since July 25, 2014. (Dkts. 19, 20.)[1]

Probation and the Government do not believe Mr. Schultz is similarly situated to Mr. Strycharske and Mr. Kaplan, for the following reasons: Mr. Schultz was the "driving force" behind the commission of this crime (Probation's Sentencing Recommendation, p. 4.); Mr. Schultz "has a criminal history which dates back to 2002" with "[a]ll but one of his crimes relat[ing] to possession or manufacture of marijuana" (*id.*); and Mr. Schultz was convicted of similar conduct in Los Angeles on August 21, 2014. Mr. Schultz concedes that his Los Angeles conviction does set him apart from his

---

[1] Conversely, the Government opposed Mr. Schultz's release and he was detained. He has been in custody since September 22, 2014. (Dkt. 36.)

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

co-defendants to some degree, but not to the extent Probation and the Government would have this Court conclude it does. The other two factors do not set him apart because, if anything, Mr. Strycharske and Mr. Kaplan were the initiating force behind this enterprise and, as to the other factor that ostensibly sets Mr. Schultz apart, this Court cannot enhance Mr. Schultz's sentence based on his criminal history given the fact that the criminal history is constitutionally invalid.

It is worth noting that Mr. Schultz's guideline range should be the starting point in the analysis, then the 18 U.S.C. § 3553 factors, and finally Mr. Schultz will address the unreasonable conclusions Probation makes in its recommendation.

## II.   Mr. Schultz's Guideline Range

The guidelines are the starting place and "initial benchmark" in determining a sentence and "are to be kept in mind throughout the sentencing process." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). A sentence within the advisory guidelines is reasonable. *See Carty*, 520 F.3d at 994 ("We recognize that a Guidelines sentence will usually be reasonable . . ."); *id.* at 996 ("The Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.") (internal citations and quotations omitted).

In the plea agreement, the parties agreed to the following offense level calculation under the U.S. Sentencing Guidelines:

    20   Base offense level, under § 2D1.10

    -3   Acceptance of responsibility, under § 3E1.1

    17   Total Offense Level

As calculated by Probation (but only after Mr. Schultz corrected the record to his own detriment), Mr. Schultz's criminal history places him in Category II. Based on a Criminal History Category of II, the applicable guideline range is 27-33 months. If this

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Court finds that an adjustment under U.S.S.G. § 3B1.1(c) is warranted, the range is 33-41 months. Based on the applicable guideline range and the 18 U.S.C. § 3553(a) factors, a sentence of 33 months of imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing. From a procedural and substantive perspective it reasonably takes into account the accidental death of N.C., the harm to other individuals, the property loss, and Mr. Schultz's subsequent conviction in Los Angeles.

## III.   Background

### A.  Acceptance of Responsibility

Mr. Schultz does not dispute that his conduct here was very serious and that he, Mr. Kaplan, and Mr. Strycharske bear responsibility for it and the consequences it caused. He takes full responsibility for his conduct and its unintended consequences as reflected by his willingness to plead guilty to the charged offenses, sparing the Government and the victims the burden of a long and costly trial. (Exhibit 1, Mr. Schultz's acceptance of responsibility letter.) Probation and the Government agree that U.S.S.G. § 3E1.1(a) and (b) apply to this case.

While in custody, Mr. Schultz has repeatedly reviewed the post-incident victim statements and other witness statements in the discovery. He is remorseful and devastated by the unintended results of his actions. He is deeply saddened that his life to this point—marred by abuse and neglect in his childhood, which fueled his own drug and mental health problems—has led to a tragedy for so many people. Mr. Schultz hopes that this tragic outcome is not the culmination of his life but rather the end to a long and difficult chapter. He hopes that this Court will give him the opportunity to redeem himself and overcome the struggles of his youth. Mr. Schultz never previously had to face and overcome the personal problems that led him to this point in his life. But now he faces his first prison sentence and the opportunity to be supervised by this Court when he is released. Mr. Schultz is ready for the challenges that lie ahead.

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### B.  Substance Abuse and Mental Health

No one can dispute that Mr. Schultz has a long and well-documented history of mental health problems, including ADHD, depression, panic disorder, schizophrenia, bipolar disorder, PTSD, and schizoaffective disorder. Defense counsel obtained hundreds of pages of records and asked Dr. William Luecke to evaluate Mr. Schultz so an informed diagnosis could be obtained to educate this Court, to assist Probation while Mr. Schultz is on supervised release, and to aid the Bureau of Prisons in treating Mr. Schultz going forward. Dr. Luecke states that the diagnoses that best summarizes Mr. Schultz's condition is schizoaffective disorder and PTSD. (Ex. 2, Psychological Evaluation by Dr. William Luecke, filed separately under seal.)

Mr. Schultz has never received proper mental health or substance abuse treatment. In addition to treatment for his various mental health issues, Mr. Schultz recognizes that he needs chemical dependency treatment to address his serious and long-term addiction to drugs. He would benefit greatly from the opportunity to participate in a drug treatment program within the Bureau of Prisons and he hopes for that opportunity during this period of incarceration. He has already participated in numerous programs at FDC SeaTac to address his chemical dependency and mental health issues. (Ex. 3, BOP documents.) He plans to learn new skills, get a job, and financially restore the victims as soon as feasible. He has requested information on Bureau of Prisons' programs from defense counsel's office. Specifically, he hopes that he can serve his prison time in FCI El Reno in Oklahoma, where he can learn to become a machinist in the UNICOR correctional program.

### C.  Mr. Schultz's Background

Mr. Schultz faced extraordinary circumstances during his formative years. From the moment he was born, he had to live with difficult circumstances which unquestionably sent him down the road to mental health issues and chemical

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

dependency. Mr. Schultz was born in South Carolina in 1982 to a 16-year-old mother and a 22-year-old father. His environment was filled with violence and instability for a number of reasons: his parents were not mature enough to seriously take on their marriage and parenting obligations; his mother suffered from bipolar disorder and schizophrenia; his parents regularly used drugs; his father never trusted his mother, believing she was promiscuous; they resolved their differences through violence (violence primarily directed at his mother but, as he grew older, secondarily directed at Mr. Schultz); the family was quite poor; and Mr. Schultz's parents did not treat him with the attention and care that a child needs during his formative years. (*See, e.g.,* Ex. 4, legal documents filed separately under seal; Ex. 5, support letters from Mr. Schultz's father and sister.)

Mr. Schultz's parents divorced when he was four years old. Regrettably, the divorce did little to extricate Mr. Schultz from the difficult environment in which he had spent his first four years, and he continued to face the same obstacles of neglect, violence, and poverty. Instead of getting better, in many ways things were even more difficult for Mr. Schultz after his parents' divorce because his father and mother used him as a means to express their anger and frustration towards each other by moving him around. In one incident, his mother even went so far as to unlawfully take him to another state, forcing the court and authorities to get involved in custody matters. Mr. Schultz's lack of supervision and care in his formative years caused him to suffer many absences in elementary and middle school. His absence from school exacerbated the problems by depriving him of the opportunity to find substitute role models like coaches, counselors, or teachers.

Mr. Schultz's father was his primary custodian after the divorce despite the family court granting his mother primary custody. The court granted her custody, acknowledging that he committed domestic violence. Unfortunately, his mother did not

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

want Mr. Schultz, and she abandoned him and moved to Georgia. The violence and mental abuse that had previously been directed primarily at Mr. Schultz's mother was then shifted to Mr. Schultz. It is unclear why Mr. Schultz's father beat him so often and so much. The only reasonable explanation that defense counsel has understood from the family is that Mr. Schultz's father was treated the same way by his own father. Out of the many instances of abuse suffered by Mr. Schultz, two stand out to defense counsel that give some idea as to what the environment was like for him: on one occasion, Mr. Schultz was beaten so badly that he soiled himself and, on another occasion, he was beaten so severely that he lost consciousness.

When Mr. Schultz visited his mother in Georgia, she did not physically or verbally abuse him. But during his formative years, she created a distorted sense of responsibility and reality for him. She was involved in a lucrative adult entertainment business, although little of that money was used to help raise Mr. Schultz. She would leave Mr. Schultz alone at her home on the weekends giving him several hundred dollars to order food and have fun. This was another form of abandonment.

Mr. Schultz continued to do poorly in middle school and high school. He did poorly in school because of multiple absences and because he did not focus on his studies. The absences and lack of focus are attributed to his chaotic home environment, the effects of his ADHD, the problems he faced at home, poor parental supervision, and his own mental health problems. During this period, Mr. Schultz did well on some standardized exams. He did not engage in criminal behavior while in school, and at home he took great care of his little sister, protecting her from the abuses of his father.

Mr. Schultz started using drugs during this period. Drug abuse provided him with the opportunity to escape his mental health issues, his family issues, and ultimately, reality. Drug abuse changed Mr. Schultz's life for the worse. Mr. Schultz would occasionally steal to feed his drug habit. The drug abuse caused him to harbor

unrealistic beliefs of love and commitment, and he had children even though he was not prepared for the obligations of parenthood. The mother of the children moved west to Washington after she herself dealt with drug-related issues.

As happens with so many of us, it would seem that Mr. Schultz grew up to be just like his parents. He suffered from drug abuse, had children at a young age, and dealt with very persistent mental demons. The one key distinction was that, unlike his father, Mr. Schultz did not show violent tendencies.

In stark contrast, Mr. Schultz's sister has found success in her life despite their difficult past. She informed defense counsel she found success because she was not submitted to the same abuse by her father. She added that she found success where Mr. Schultz did not because Mr. Schultz was there to protect her; no one was there to protect Mr. Schultz. In many ways, Mr. Schultz sacrificed his own mental and emotional well-being and development to make sure that his sister was in the best possible position to thrive and overcome that upbringing. She added that drugs, coupled with his mental health issues, changed her brother to such a degree that there came a time when she no longer recognized him. She observed that drug abuse made Mr. Schultz weak, fearful, and lonely for many years. She noted that he was a frequent visitor at emergency rooms, both to treat his various conditions and to seek drugs.

Drug abuse provided him an opportunity to get involved in the state legalized marijuana industry in both California and Washington. He felt guilty about losing his children and moved across the country to be closer to them. He did not want them to feel as though he abandoned them like he was abandoned by his own mother. What he failed to see was that his decision to get involved in the marijuana industry in Washington would do what he feared most: take him away from his children.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### D.  Criminal Record Other than the Los Angeles Conviction

Mr. Schultz's criminal record that may be considered by this Court is minimal, consisting only of one conviction for petit larceny. The other South Carolina convictions identified by Probation are uncounseled misdemeanors and therefore constitutionally invalid. Probation agreed with Mr. Schultz on this point by not assigning them criminal history points when defense counsel provided records showing that all the South Carolina convictions, with the exception of the petit larceny conviction, were obtained in absentia, without the benefit of counsel, and with the imposition of a jail sentence.  In *United States v. Cousins,* 455 F. 3d 1121, 1126-27 (10th Cir. 2006), the Court held that South Carolina convictions like those at issue in Mr. Schultz's case should not be used for the same reason.

However, Probation recommends a 120-month sentence in this case arguing under "U.S.S.G. § 4A1.3, the Court could find the defendant's criminal history category is underrepresented since three of his prior convictions were not assessed criminal history points because attorney representation could not be confirmed" and "[h]e has a criminal history which dates back to back to 2002. All but one of his crimes relate to the possession or manufacture of marijuana." (*See* PSR, ¶ 95; Sent. Rec., p. 4.)

Mr. Schultz objects to Probation's position.  Probation's recommendation is flawed for two reasons. The prior convictions do not fit in the examples described in U.S.S.G. § 4A1.3(2)(A)-(E) that describe the basis for an upward departure. The uncounseled convictions may not be used to enhance this conviction because the lack of counsel and the nature of the proceedings (*in absentia*) under which the convictions were obtained undermine their reliability. *United States v. Hookano,* 957 F.2d 714, 716 (9th Cir. 1992).

Probation's attempt to include the invalid convictions under § 4A1.3 is no different than including them under § 4A1.1. The reason uncounseled convictions are

excluded is that they are unreliable. The § 4A1.3 approach suggested by Probation does not make the convictions or the facts underlying them any more reliable. This is because no attorney was present to test the reliability of the charges underlying the convictions. If such convictions cannot be used to increase a defendant's criminal history, it would be an absurd result for a court to then consider them as factors independent of criminal history that justify an increased sentence. They cannot lawfully be used in computing criminal history for constitutional reasons, and they simply cannot be used as a basis, either officially or unofficially, to increase Mr. Schultz's sentence.

### E.  The Los Angeles Conviction

Probation also points to Mr. Schultz's subsequent Los Angeles conviction as a reason to increase his sentence, arguing that "the defendant's choice to engage in the exact same dangerous behavior less than one year later is extremely concerning. This decision is simply inexplicable and supports a sentence of 120 months." (Sent. Rec. p. 5.) Probation's recommendation fails to tell this Court the whole story behind this conviction, fails to take into account countervailing guideline factors, and is flawed.

Initially Probation had assigned this conviction one point. Mr. Schultz asked defense counsel to correct Probation's assessment because, in fact, he had been sentenced to 365 days. Defense counsel obtained records, spoke to Mr. Schultz's counsel in Los Angeles, then provided the correction along with supporting documents to Probation in an objection letter. Defense counsel learned that, because the facts of this case were brought to the Los Angeles court's attention shortly before it could accept his plea, instead of receiving 90 days in custody with 200 hours of community service or no days in custody with 600 hours of community service, Mr. Schultz was sentenced to 365 days in custody and 5 years of probation for his Los Angeles conviction. (Ex. 6, Declaration of Alvin Thomas.)

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    As a result, Mr. Schultz's Criminal History Category in this case increased from

2  I to II. The Los Angeles conviction does not support Probation's recommendation for

3  *any* increase because it has been taken into account under Mr. Schultz's criminal

4  history category in an unusual manner, i.e., the facts of this case were used to enhance

5  his Los Angeles conviction exposing him (1) to harsher penalties in California and (2)

6  increasing his criminal history category in the Western District of Washington.

7    Second, because Mr. Schultz was first sentenced in Los Angeles, then brought to

8  federal court by way of *writ ad prosequendum,* California retained primary jurisdiction

9  over Mr. Schultz. Consequently, Mr. Schultz is not entitled to credit for time served in

10 federal custody when he was transferred under writ to the Western District of

11 Washington. *Thomas v. Brewer*, 923 F.2d 1361, 1367 (9th Cir.1991). However, Mr.

12 Schultz may get credit for time served in federal custody from the time he was released

13 from state custody. *Del Guzzi v. United States*, 980 F.2d 1269 (9th Cir. 1992). Defense

14 counsel has learned from an online docket that Los Angeles County relinquished

15 primary jurisdiction on January 28, 2015. (Ex. 7, LA Sheriff's Department docket.) Mr.

16 Schultz will not receive 129 days credit for time spent in federal custody.[2] The Court

17 cannot give Mr. Schultz double credit for his detention time while the state retained

18 primary jurisdiction over him under 18 U.S.C. § 3585. *United States v. Wilson*, 503

19 U.S. 329, 337 (1992).

20   Apart from the harsher penalty and the increase in criminal history, the Los

21 Angeles conviction has impacted Mr. Schultz's sentence a third way. He will not get

22 credit for time served while Los Angeles retained primary jurisdiction over him.

23 Indeed, given the unique facts surrounding how the sentence was obtained in Los

24 Angeles, Mr. Schultz is entitled to a downward variance under U.S.S.G. §§ 5G1.3

25

26 [2] This is the length of time between September 22, 2014, when he was taken into custody by
way of writ, and January 28, 2015, when the state relinquished primary custody.

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

and/or 5K2.23, because Probation is seeking to use it as relevant conduct for the present offense. *United States v. Pietkiewicz,* 712 F. 3d 1057, 1060-61 (7th Cir. 2013).

Third, Probation suggests that Mr. Schultz, with full knowledge that he was criminally responsible for the incident in Washington, went down to Los Angeles and engaged in similar conduct. They distinguish Mr. Schultz from his co-defendants by arguing that they cooperated while Mr. Schultz did not cooperate. Shortly after the incident, Mr. Schultz was heavily medicated with 32 mg of morphine and 5 mg of valium. He was taken into the intensive care unit at the Harborview Hospital. (Ex. 8, medical records, photo.) Subsequently, he spent time in the psychiatric unit at the Harborview hospital. Upon his release from the hospital, the Bellevue Police Department did not arrest, detain him, or attempt to interview him. Mr. Schultz returned back to South Carolina to recover. Federal and state authorities did not attempt to question him or detain him while he was there. As far as Mr. Schultz knew, he was not under suspicion or threat of prosecution based on the fire in this case. Such an assumption may have been naïve, but it is true and runs contrary to the narrative that he knew what he had done was wrong and continued to flaunt the law when he traveled to Los Angeles.

The indictment was filed against Mr. Schultz on July 30, 2014. (Dkt. 23.) An arrest warrant was issued on the same day. (Dkt. 47.) Mr. Schultz was not aware there was a warrant for his arrest until he was confronted by the Los Angeles Police Department ("LAPD") while staying at a motel, a week later, on August 7, 2014. The LAPD officers located him because he was using his real name and real driver's license number. When the LAPD officers confronted him to execute the Washington arrest warrant, they did so outside the motel room. Mr. Schultz cooperated fully with the officers when he learned he was being criminally charged in Washington, answering all of their questions and giving them full consent to search his person and his motel room.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

When asked if he was manufacturing hash oil at the motel, he informed them that he was not doing it there but rather at marijuana dispensaries in the area. He stated that he only dried out the hash oil in the room.[3] In retrospect, Mr. Schultz realizes it was clearly a mistake to continue to engage in production of hash oil in any capacity following this incident. However, sentencing him to a 120-month prison term for that conduct is substantively and procedurally unreasonable because as explained it has been already taken into account in three different ways.

### F.  The Offense

**1.  Mr. Schultz objects to the application of an upward departure under U.S.S.G. § 5K2.0(a)(1)(A) or a sentence outside of the advisory guideline range because the guideline already takes into account the public safety concern underlying the statute.**

Sentences imposed based on the offenses charged in Counts 2 and 3 are driven by the kind of drug involved and the amount trafficked. The recommended sentence of 120 months for Count II and 60 months for Count III is unreasonable given the amount of drugs seized in this case. (Ex. 9, lab report.) Count I, the charge of Endangering Human Life while Manufacturing a Controlled Substance, 21 U.S.C. § 858, has a different focus. It aims to penalize defendants for the public safety hazard they create by their activity. In effect, the statute takes into account the possible traumatic consequences that came about in this case. It does not contemplate enhancements like those provided for in methamphetamine cases because methamphetamine production has additional harms associated with it. (*See* Ex. 10, meth pamphlet.)

---

[3] The Los Angeles District Attorney would not have made a no-jail-time offer to Mr. Schultz for his conduct, and the Los Angeles County Court would certainly have not sentenced him to no jail time, if they believed that he in fact was manufacturing hash oil in the motel room. *See People v. Bergen,* 166 Cal. 4th 161, 167 (Cal. App. 2d, 2008) (Los Angeles County Court imposed a sentence of five years on a defendant who manufactured hash oil at a residence using the butane hash oil method).

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Here, the controlled substances in question were marijuana and hashish oil. The amounts involved were small. But for the explosion, there would probably have been no federal interest in this case, particularly in light of Washington's decision several years ago to legalize the cultivation and sale of marijuana. The guideline that applies to this case, U.S.S.G. § 2D1.10, sets a minimum base level of 20 for any violation of 21 U.S.C. § 858, regardless of the amount or type of drug involved. This no doubt reflects the public safety concern underlying the statute.

> ## 2. Mr. Schultz objects to the application of U.S.S.G. § 3B1.1(c) in this case because he was in effect Mr. Strycharske's and Kaplan's agent and/or employee.

Daniel Strycharske was a computer programmer at Microsoft. Jesse Kaplan was a software developer at Microsoft. Between the two, they make somewhere between $100,000 and $150,000 per year. (*See*, *e.g.*, Ex. 11, pay stub filed under seal.) They had the finances to start a marijuana growth business by purchasing the equipment and supplies. Strycharske and Kaplan have been friends since 2009. Strycharske rented an apartment at Hampton Greens Apartments on March 8, 2013. Kaplan became Strycharske's roommate in April 2013. Kaplan paid half the rent. Strycharske and Kaplan both obtained marijuana from the Hope Clinic using state-issued medical marijuana licenses. Strycharske and Kaplan grew six marijuana plants in the closet inside the apartment and consequently endangers human life. They wanted to take financial advantage of Washington's new marijuana laws. Subsequently, they met Mr. Schultz at the annual Seattle event known as Hempfest. Mr. Strycharske and Mr. Kaplan paid Mr. Schultz to watch the apartment. They also invited him into their home because they wanted Mr. Schultz to show them how to process marijuana into hash oil.

Mr. Schultz objects to U.S.S.G. § 3B1.1(c) in this case because he was in effect Mr. Strycharske's and Mr. Kaplan's agent and/or employee. They were the principal operators behind this operation providing the money and the facilities. As Probation

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

notes, Mr. Schultz "stayed with friends or on the streets" until meeting his co-defendants. (PSR ¶ 59.) Mr. Schultz may have bought the tools associated with the operation, but the money came from Mr. Strycharske and Mr. Kaplan. They got involved in the hash oil-based marijuana products because they were more lucrative than marijuana plants alone; they sold for $40, $60, or more per gram, depending on the quality. Further, under Washington law, people could buy 16 ounces of oil in solid form or 72 ounces in liquid form. Such transactions could runs tens of thousands of dollars. Without his co-defendants' marijuana plants, money, and apartment, this offense would likely not have occurred. It is troubling that Probation would suggest that Mr. Strycharske and Mr. Kaplan, who unlike Mr. Schultz had financial opportunities at Microsoft, deserve a 48-month sentence in this case as opposed to a 120-month sentence for Mr. Schultz.

In addition to the facts related to the defendants, it is also important to consider the situation surrounding the legalization of marijuana under state law. The law created uncertainty. The downside to the Washington laws was that they were ambiguous and they did not consider the safety risks surrounding the manufacturing process. (Ex. 12, USA Today article.) The number of hash oil manufacturing operations increased, and regulators were playing catch-up with the consequences of legalization. For this reason the Bellevue Police Department did not stop the three defendants when they learned what they were doing weeks prior to the incident in this case. (Ex. 13, Transcript of Elena A. Stanescu Recorded Statement.) The hash oil problem metastasized when operations exploded causing damage to property, life, and limb. The defendants' conduct arose under these conditions.

The final PSR (the draft PSR did not) and the Government now state that Mr. Schultz was the one producing the hash oil when the explosion occurred. Mr. Schultz emphatically denies this allegation because there is no evidence suggesting that he was.

DEFENDANT'S SENTENCING MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 15

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

King County started to charge Mr. Schultz with manslaughter in the second degree under RCW 9A.32.070(1) advancing the same theory advanced by the Government in their sentencing memorandum but did not because they had no evidence to prove that he was directly responsible for the fire.[4] Due process requires that a defendant be sentenced on the basis of accurate information, *Roberts v. United States*, 445 U.S. 552, 563 (1980), which connotes information that is reliable. *United States v. Littlesun*, 444 F.3d at 1199 (9th Cir. 2006); *United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001).

Probation and the Government seek to drastically increase Mr. Schultz's sentence relative to those of his co-defendants based on the barest of circumstantial evidence supporting a theory he was making hash oil when the fire started. If there wasn't probable cause to charge him with manslaughter or another offense under state law then this Court cannot rely on Probation's and the Government's allegation he should be sentenced to 120 months or enhance his sentence under U.S.S.G. §§ 5K2.1, 2.2, or 2.5 because he was making hash oil when the fire started. The Ninth Circuit requires that facts that will have a disproportionate impact on the ultimate sentence— such as facts supporting a significant adjustment under the Guidelines—must be established by clear and convincing evidence. *United States v. Bonilla-Montenegro*, 331 F.3d 1047, 1050 (9th Cir. 2003); *United States v. Staten*, 466 F.3d 708, 720 (9th Cir. 2006). Likewise, where a severe sentencing enhancement is imposed on the basis of uncharged conduct, due process may require clear and convincing evidence. *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010).

Even if Mr. Schultz was independently found to be the proximate cause of N.C.'s death based on a theory of involuntary manslaughter, his guideline range would be 10 to 16 months, nowhere near the 120 months recommended by Probation. Under

---

[4] "Based on the findings of the autopsy and investigations, the manner of death is classified as accident." (PSR ¶ 16.)

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 16

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

U.S.S.G. § 2A1 .4(a)(l) the base level offense is 12. Assuming the Court agrees U.S.S.G. § 3B1.l(c) applies over defendant's objection, and that a three-point reduction for acceptance of responsibility is appropriate, then the total offense level would be 11. Based upon a total offense level of 11 and a criminal history category of II, the guideline imprisonment range is 10 months to 16 months.

**IV.   Conclusion**

Again, Mr. Schultz does not dispute that his conduct here was very serious and that he bears responsibility for his conduct. The objections raised in this memorandum are meant in no way to take away from what has happened in this case or disrespect anyone's loss. He takes full responsibility for his actions and their unintended consequences including the loss of property, injuries suffered by individuals jumping from the building to escape the fire, emotional trauma associated with the whole incident, the resources expended by the city of Bellevue and its fire department for having to respond to the incident, and most important, the accidental death of N.C. Mr. Schultz, with the assistance of defense counsel, has learned a great deal about who N.C. was and her role in the community. Defense counsel has spent a great deal of time with Mr. Schultz talking about this case. Her death deeply troubles him not only because of the death itself but also because he learned that she was a person of great character who helped individuals like Mr. Schultz.

Since his arrest and detention at the FDC, Mr. Schultz has reestablished a relationship with his father and is addressing the problems that led to the underlying offense. He is taking courses, taking medication, and receiving ongoing mental health treatment. He has not tried to get involved in his children's lives because he does not feel he is mentally ready to responsibly take on those obligations until he first addresses his substance abuse and his mental health issues. He would like to be placed in custody at FCI El Reno in El Reno, Oklahoma, where he can learn to become a machinist so he

1   can work when he returns to Washington. His father and his sister are emotionally

2   supporting him through this process. They intend to emotionally support him when

3   released.

4         18 U.S.C. § 3553(a) instructs courts to impose sentences "sufficient, but not

5   greater than necessary" to achieve the statute's enumerated goals. A sentence of thirty-

6   three months in prison, plus three years of supervised release, will be sufficient

7   punishment for Mr. Schultz. His conduct was criminal, but he never intended to harm

8   persons or property. He has permanent nerve damage to his hands. He is physically

9   scarred. The Los Angeles conviction was enhanced because of his conduct in

10  Washington. He was forthright with Probation about his Los Angeles conviction which

11  in effect increased his criminal history category. He is a product of unfortunate

12  circumstances, both biological and environmental.

13        Mr. Schultz has started making great strides to overcome addiction since he has

14  been brought to Washington to face charges. Mr. Schultz has also made great strides to

15  overcome addiction and mental health problems since he has been at the FDC. The

16  sentence imposed in this case will be an opportunity for Mr. Schultz to change the

17  course of his life, which he wants. But he should not be used as a scapegoat or a symbol

18  for serious problems that arise in a State that has voted to legalize marijuana, or for the

19  entrepreneurs who employed him while trying to make money under the new laws. His

20  punishment should be sufficient but not more than necessary to effectuate the goals of

21  sentencing. For all these reasons, the defense asks the Court to impose thirty-three

22  months, plus three years of supervised release.

23        DATED this 2nd day of June, 2015.

24                              Respectfully submitted,

25

                            s/ *Mohammad Hamoudi*

26                              Assistant Federal Public Defender
                            Attorney for David Richard Schultz, II

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

**CERTIFICATE OF SERVICE**

2       I certify that on June 2, 2015, I electronically filed the foregoing document with

3   the Clerk of the Court using the CM/ECF system, which will send notification of filing

4   to all registered parties.

5

6                                        s/ *Suzie Strait*
                                         Paralegal

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S SENTENCING
MEMORANDUM
(David Richard Schultz, II, CR14-232-JLR) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**